Syllabus.

# Richmond.

## WRIGHT V. WRIGHT.

### November 14, 1918.

1. ANSWER—*Allegations in Bill Not Responded To—Admissions.*— Allegations of a bill not denied or noticed in the answer are not to be taken as admitted by the defendant, but, if material to the plaintiff's case, must be proved by independent testimony. If the plaintiff desires to insist upon a response to such allegations he should except to the answer for insufficiency. This rule, however, is subject to the qualification that on a motion to dissolve an injunction, the allegations not denied or admitted in the answer must be taken as true.

2. ANSWER—*Allegations in Bill Not Responded To—Admisions.*— In the instant case, a suit to set up a will alleged to have been destroyed, there was no exception to the answer, and the case was heard, not upon the bill and answer, but upon the bill, answer and depositions. There was no direct and specific denial of the one-time existence and subsequent destruction of the alleged will, and in this particular the complainants (appellants), contended that the answer was not sufficient.

   *Held:* That if the objection made to the answer would have been good as an original proposition, it was not available on appeal.

3. WILLS—*Lost Wills—Evidence To Establish.*—Even in cases where the evidence comes from disinterested sources, clear and conclusive proof is required.

4. WILLS—*Lost Wills—Evidence—Case at Bar.*—The instant case was a suit to set up and establish the last will and testament of a decedent, a writing alleged to have been executed by him and destroyed subsequent to his death. The complainants, a son of decedent and his wife, the beneficiaries under the alleged will, were the only witnesses offered to sustain the allegations of the bill. The evidence in itself was unsatisfactory and unconvincing and its strength was necessarily further impaired by the situation of the parties and the interest of the witnesses.

*Held:* That the decision of the trial court that the complainants had not sustained the burden resting upon them, was right.

5. LOST WILLS—*Burden of Proof*.—In a suit to establish a lost will, the burden of proof which the law imposes upon the complainant is not shifted to the defendant merely by the production of evidence tending materially to establish the allegations of the bill, and which in the more common forms of litigation would constitute a *prima facie* case of recovery or relief.

6. LOST INSTRUMENTS—*Evidence To Establish*.—Where the instrument rises to the dignity and importance of a muniment of title, every principle of public policy demands that the proof of its former existence, its loss and its contents, should be strong and conclusive, before the courts will establish a title by parol testimony to property which the law requires shall pass only by deed or will. That courts of equity have jurisdiction to set up lost deeds or wills, and to establish titles under them, can certainly not be denied, but it is a dangerous jurisdiction and so pregnant with opportunities of fraud and injustice that it will not be lightly exercised, nor except upon the clearest and most stringent proof.

7. LOST INSTRUMENTS—*Evidence To Establish*.—It is not practicable to formulate a general rule which would define for every case of this class the degree of proof required. A mere "preponderance of evidence" is certainly not sufficient; proof "beyond a reasonable doubt" would be more nearly within the requirement as generally recognized and enforced, although the latter expression has not always been approved by the authorities.

Appeal from a decree of the Circuit Court of Albemarle county. Decree for defendants. Complainants appeal.

*Affirmed.*

The opinion states the case.

*E. O. McCue* and *Allen & Walsh,* for the appellants.

*Watson & Bolling,* for the appellees.

KELLY, J., delivered the opinion of the court.

The object of this suit was to set up and establish as the last will and testament of Thos. W. Wright, deceased, a writing alleged to have been executed by him and destroyed subsequent to his death.

Thos. W. Wright, a former resident of Pennsylvania, moved to Albemarle county, Virginia, in November, 1915, and took up his residence with his son, Thos. W. Wright, Jr., who, with his wife, was then residing upon a small farm owned by Thos. W. Wright, Sr. There were no children in the family, and the three lived together until the father died in July, 1916. The elder Wright's wife was dead, and his only children were Thos. W. Wright, Jr., and Edward J. Wright.

The bill, which was filed by Thos. W. Wright, Jr., and his wife, alleges, in addition to the foregoing facts, that the substance of the will was as follows: "I leave my farm and all my personal property and jewelry to Thos. W. Wright, Jr., and Mrs. Thos. W. Wright, Jr., and at their death it is all to go to the Masonic Lodge of Pa., Philadelphia, Pa.;" that the will was written in Pennsylvania, before the testator moved to Virginia; that afterwards, in May, 1916, he showed the writing to Mrs. Wright, read and explained it to her, and declared it to be his last will and testament; and that sometime after his death it "was destroyed by some third person, without the direction or consent of the deceased."

[1, 2] Edward J. Wright was made a party defendant and filed an answer admitting the immaterial allegations of the bill, but denying specifically "that Thos. W. Wright, Sr., left any true last will and testament," and calling "for strict proof of each and every averment contained in said bill other than those herein admitted to be true." The answer, furthermore, averred that if Thos. W. Wright made any such writing as was alleged, his mental condition was such, and the undue influence exerted over him by the com-

plainants was such, as that the writing could not be probated as his will. There was no direct and specific denial of the one-time existence and subsequent destruction of the alleged will, and in this particular the complainants (appellants here), contend that the answer was not sufficient. If we concede, however, that the answer as a whole cannot fairly be construed as denying all the material allegations of the bill, and particularly those relating to the existence and destruction of the writing in question, the position of the appellants is not thereby improved.

In *Clinch River Mineral Co.* v. *Harrison,* 91 Va. 122, 21 S. E. 660, this court, speaking through Judge Cardwell, said: "In *Dangerfield et al.* v. *Claiborne et al.,* 2 H. & M. (12 Va.), page 17, the learned chancellor of the Supreme Court of Chancery for the Richmond District, after stating the question to be, whether allegations in the bill not answered shall be considered as admitted, or must be proved by the plaintiff, says: 'The rule in future will be understood and settled, that where the answer is not responsive to a material allegation of the bill, the plaintiff may except to it as insufficient, or may move to have that part of the bill taken for confessed; but if he does neither, he shall not, on the trial, avail himself of any implied admission by the defendant; for, where the defendant does not answer at all, the plaintiff cannot take his bill for confessed, without an order of the court to that effect, and having it served upon the defendants; and this is the only evidence of his admission. Of course, if this mode of proceeding as to the confession of the whole bill be correct, it must be equally correct as to the confession of any part.' This rule has been followed in all the cases reported in our State reports where the question has arisen, and maintained by our learned commentators. *Argenbright* v. *Campbell et ux,* 3 H. & M. (13 Va.) 165; *Coleman* v. *Lyne,* 4 Rand. (25 Va.) 454; *Cropper* v. *Burtons,* 5 Leigh (32 Va.) 426, 432; *Miller* v. *Argyle's Ex'or*

*et al,* 5 Leigh (32 Va.) 460; Robinson's Prac., Vol. 2, 213, and Barton's Chan. Prac., Vol. 1, 398 and 399.

"Says Barton: 'Those allegations of a bill which are not responded to by the answer, although an exception would properly lie on that account, are yet not to be taken as admitted, but must be proved by the plaintiff.' " And in a note to this case in 1 Va. Law Reg., page 45, there is the following comment by Judge E. C. Burks: "It seems to the writer that the rule, as stated in the opinion of the court, is clearly established in Virginia by the authorities cited, and that there is no Virginia decision *contra.* The rule is, however, subject to a qualification not mentioned in the opinion, doubtless, because it was not necessary to the decision of the case in judgment. The qualification is this: that on a motion to dissolve an injunction, the allegations not denied or admitted in the answer must be taken as true, and this for the reasons given by Judge Green in *Randolph* v. *Randolph,* 6 Rand. (27 Va.) on page 197. This is an exception to the general rule before stated. The rule as stated prevails in most jurisdictions, certainly in Virginia. In some of the States it has been changed by statute, as, for instance, in West Virginia. See Code of West Virginia, chapter 125, section 36. The existence of these statutes serves to show that the law was otherwise before their enactment. We have no such statute in Virginia. There can be no higher judicial authority than Chief Justice Marshall, who, in *Young* v. *Grundy,* 6 Cranch 51, 3 L. Ed. 149, puts the statement of the rule, with its qualification, in a nut shell, thus: 'If the answer neither admits nor denies the allegations of the bill, they must be proved upon the final hearing. Upon a question of dissolution of an injunction they are to be taken as true.' " See also Lile's Notes on Equity Pl. & Pr. (1916), page 93, section 206, where the learned author says: "That allegations of the bill not denied or noticed in the answer are not to be taken as admitted by the defendant, but, if

material to the plaintiff's case, must be proved by independent testimony. If the plaintiff desire to insist upon a response to such allegations he should except to the answer for insufficiency," citing *Coleman* v. *Lyne's Ex'r*, 4 Rand. (25 Va.) 454. See also 1 Ency. Pl. & Pr. 930; 10 R. C. L. page 445; 16 Cyc. 312. In this case there was no exception to the answer, and the case was heard, not upon the bill and answer, but upon the bill, answer and depositions. If the objection here made to the answer would have been good as an original proposition, it is not now available. *Coleman* v. *Lyne's Ex'r*, D *Rand.* (25 Va.), 456.

The complainants themselves were the only witnesses offered to sustain the allegations of the bill. In view of the peculiar nature of the case, their testimony cannot, with entire fairness to both sides, be reduced to narrative form, and it is, therefore, here set out in full in so far as it relates to the question of the former existence, the contents, and the destruction of the will. Thos. W. Wright, Jr., testified in that regard as follows:

"Did your father leave a will?

"A. Yes.

"Did you ever see this will?

"A. It was enclosed in an envelope to be opened before a lawyer and it was read before a lawyer in Charlottesville. Yes, I saw the will.

"Q. Was the will in the handwriting of your father?

"A. Yes.

"Q. Was it signed by him?

"A. Yes.

"Q. Was it wholly in the hand-writing of your Father?

"A. Yes.

"Q. Was it dated?

"A. Yes.

"Q. Can you give me the date?

"A. I think it was the 1st day, I am not sure, of July, 1914.

"Q. In the bill and amended bill is set forth, a memorandum of the purport of said will; as well as you can remember is this substantially correct?

"A. Yes. The copy of the will seems the same as the original.

"Q. Was your father a mason?

"A. Yes.

   *     *     *     *     *     *     *     *

"Q. When did you see this will?

"A. I saw it the day I carried it to Charlottesville, some days after his death. I could find out the date.

"Q. Do you happen to know whether this will is in existence now?

"A. No.

"Q. Do you know whether your father ever directed that will to be revoked or destroyed?

"A. No.

"Q. Do you know whether the said will is in existence to-day?

"A. No, positively it is not.

"Q. Do you know that it is not?

"A. Yes.

"Q. What happened to it?

"A. It was destroyed.

"Q. Do you know that it was destroyed?

"A. I do.

"Q. Have you ever found a copy of this will or any other will left by your father?

"A. I have not.

   *     *     *     *     *     *     *     *

"Q. Mr. Wright, where did you find this paper that you speak of as a will?

"A. Among my father's effects.

"Q. Did you open the paper?

"A. No.

"Q. How soon after the death of your father was this paper opened?

"A. About the correct date, I am not sure, I think it was the Wednesday after my father's death.

"Q. Where were the papers opened?

"A. Charlottesville.

"Q. Did you make any copy of that paper?

"A. No.

"Q. Mr. Wright, where did you say this will was first opened?

"A. It was first opened in Charlottesville."

Mrs. Thos. W. Wright, Jr., testified, upon the same points, as follows:

"Q. During that time (while he lived in Virginia) did he ever show you a will?

"A. He did.

"Q. Whose will?

"A. His will.

"Q. Did you see it?

"A. I did.

"Q. Did you read it?

"A. Yes.

"Q. Did he make any comments?

"A. He read and explained it to me.

"Q. In whose hand-writing was that?

"A. His own hand-writing.

"Q. Can you give me the substance of what he said about it?

"A. He read and explained it to me, and I asked him what lodge he meant and he said he meant his own lodge, Robert Lamberton Lodge No. 487.

"Q. Is that all he said about it?

"A. He said that was his will, and he wanted to show it to me and explain it to me, that was all.

16

\*      \*      \*      \*      \*      \*      \*      \*

"Q. Where did he get it from?

"A. Out of his trunk.

\*      \*      \*      \*      \*      \*      \*      \*

"Q. How many times did Mr. Wright read the will to you?

"A. Only once.

"Q. When was the last time you saw the alleged will?

"A. I didn't see the original will any more. I saw a copy. He sealed it after showing it to me, and I put it back in the trunk.

"Q. Did you ever make a copy of this will?

"A. No.

"Q. Mrs. Wright, if you only heard this paper read once, how does it happen that you remember what the contents of it were?

"A. Well, I remember as near as I could, it wasn't much to remember.

"Q. Do you know where this paper was written?

"A. Philadelphia.

"Q. Where were you when the paper was read to you.

"A. Near North Garden, Virginia.

"Q. How long before Mr. Wright's death was it?

"A. As near as I can recall, it was between the 1st and 5th of May, 1916.

\*      \*      \*      \*      \*      \*      \*      \*

"Q. Mrs. Wright, do you know where this paper that you speak of was found after Mr. Wright's death?

"A. Among his effects.

"Q. Whereabouts among his effects.

"A. His trunk.

"Q. Who found it?

"A. My husband.

"Q. How do you know that?

"A. Because he told me so. He got it out of the trunk.

"Q. Who did he tell so?

"A. Me.

"Q. Who had the key to the trunk?

"A. I had the keys. The keys were there in the house and keys to other things.

\*        \*        \*        \*        \*        \*        \*        \*

"Q. Did the paper you speak of mention anything about Mr. Edward Johnston Wright?

"A. No.

"Q. Do you know how that happened, that he cut one of his sons completely in this alleged will?

"A. Yes, I do.

"Q. But he didn't say anything about him in the paper, did he?

"A. No.

"Q. Where is the copy that you speak of having seen after Mr. Wright's death?

"A. I saw it; it must be in the Clerk's office, I guess.

"Q. Is it the copy you speak of, what is written on the bill filed in this cause?

"A. Yes.

"Q. Is the copy written on the bill which I have just shown you with a green back, the only copy of this paper which you have seen?

"A. Yes.

"Q. Do you know whether that copy was made after the destruction or before the destruction of the old will?

"A. It was made afterwards.

"Q. Mrs. Wright, were you present when this will was lost or destroyed?

"A. No.

"Q. Did you have anything to do with the loss or destruction of the will?

"A. No.

"Q. Did you ever see this paper you refer to, after you say Mr. Wright read it in May, 1915?

"A. No, it was sealed then.

"Q. Did your father-in-law seal the paper up, or did you?

"A. He sealed it and asked me to put it back.

\*        \*        \*        \*        \*        \*        \*

"Q. Do you know how long Mr. Wright has been expecting to leave you and your husband all the property?

"A. Well, he always told me that.

"Q. Do you know whether he ever changed his mind or intentions in regard to leaving you and your husband the property or even expressed to other people how he was going to leave the property?

"A. No.

"Q. When did he first tell you that he was going to leave the property all to you and your husband?

"A. After his wife's death.

"Q. Do you remember what year that was?

"A. 1915."

The only other witness who testified in the case was A. P. Walker. He was introduced by the defendant, Edward J. Wright, and merely stated that he was the duly appointed curator of the estate of Thos. W. Wright, deceased, had made search among the latter's effects for a will, and found none.

Upon the evidence, as substantially set out above, the circuit court held that the complainants had not sustained the burden resting upon them, and accordingly entered a decree dismissing their bill. From that decree the complainants have appealed.

[3, 4] We are of opinion that the decision of the circuit court was right. Even in cases where the evidence comes from disinterested sources, clear and conclusive proof is required before a court of equity will grant relief of the character sought here. In the instant case, the evidence in itself

is unsatisfactory and unconvincing and its strength is necessarily further impaired by the situation of the parties and the interest of the witnesses. Our statute, section 2529 of the Code, recognizes this latter consideration and declares that persons taking any beneficial interest in the estate devised or bequeathed by a will shall not be competent attesting witnesses thereto, except upon certain conditions obviating the temptation which might otherwise lead to false and fraudulent testimony. The opportunity and the inducement for persons situated as were the complainants in this case to set up false and fraudulent evidence of title cannot be overlooked. Principles of general public interest and policy are involved which overreach individual cases. It is not necessary for us to hold that in this particular instance there was in fact any fraudulent scheme or any false testimony. What we do decide is that the circuit court was right in holding that the complainants had not, according to the measure of proof required in all such cases, satisfactorily sustained the allegations of their bill.

Upon the question of the destruction of the will—a question equally as vital to his case as that of its former existence—Thos. W. Wright, who alone undertakes to say that it was destroyed, leaves the matter shrouded in a mystery created by his own testimony. It will be observed that he stated positively and with emphasis *that he knew the will was destroyed;* and yet he leaves the court to guess as to how he knew that fact, and as to the time, place, manner, and agency of its destruction. So too, as to the existence and contents of the will, he fails to give the court the benefit of information which ought to have either corroborated or clarified his narrative. Who was the lawyer in Charlottesville to whom he took the will, and before whom it was read? Why was he not produced as a witness? What became of the will after it was read to this lawyer? Was it left with him, and if not, where was it taken? When,

where, how, and by whom or what was it afterwards destroyed? Did the witness himself, or did "some third party" as alleged in the bill, destroy the paper? These are questions every one of which the complainant, Thos. W. Wright, Jr., could have answered satisfactorily, if his other answers in regard to the will (which were exceedingly brief) were true. Whether his failure to give the court this additional light was due to inadvertence or to design on his part, the result is the same, namely, that his evidence is incomplete, inconclusive, and therefore, insufficient to entitle him to the relief which he has sought in this case.

[5] It is contended on behalf of the complainants that they had done all that they were required to do when they had testified to the bare existence and destruction of the alleged will, and had stated its contents; and that it was then incumbent upon the defendant to test the weight and credibility of the evidence by cross-examination. This contention, however, cannot be sustained, either upon reason or authority. In cases of the class to which this one belongs, the burden of proof which the law imposes upon the complainant is not shifted to the defendant merely by the production of evidence tending materially to establish the allegations of the bill, and which in the more common forms of litigation would constitute a *prima facie* case for recovery or relief. Numerous authorities are cited by counsel in support of the proposition that evidence weak in itself may often be strengthened by the presumption arising from a failure to cross-examine the witnesses upon it, or to contradict it by other evidence. It is safe to say, however, that none of these authorities go to the extent of holding that the presumption here invoked can be availed of until the party having the burden of proof has proceeded far enough with his evidence to shift the burden to the other side. In other words, the presumption can never be used to relieve the opposing party from the *onus*

of proving his own case. (1 Jones' Com. on Ev., section 22, page 137.)

[6, 7] It is not practicable to formulate a general rule which would define for every case of this class the degree of proof required. A mere "preponderance of evidence" is certainly not sufficient; proof "beyond a reasonable doubt" would be more nearly within the requirement as generally recognized and enforced, although the latter expression has not always been approved by the authorities (17 Cyc. 771, 772, 773).

In *Moses* v. *Trice,* 21 Gratt. (162 Va.) 556, 565 (8 Am. Rep. 609), Judge Staples (speaking of the proof necessary to maintain an action upon a lost negotiable note) said: "The degree of evidence necessary to constitute such proof can never be previously defined. It is impracticable, in the nature of things, to lay down any rule on the subject. The only legal test in this, as in other cases, is the sufficiency of the evidence to satisfy the jury beyond reasonable doubt that the note is no longer in existence."

In 17 Cyc., p. 778, it is said: "In order to establish a lost instrument on behalf of a party asserting rights under it, the same measure of proof is required as in suits for reformation of instruments or to establish parol trusts; that is to say, the evidence must be of the clearest and most satisfactory character, and according to some authorities beyond reasonable doubt."

In *Fudge* v. *Payne,* 86 Va. 303, 308, 10 S. E. 7, 8, a case in which it was sought to reform a contract, and in which, therefore, the same rule applies as in this case, the court said: "But we must remember that, while courts of equity will in such cases admit parol evidence to establish in truth the real contract between the parties, notwithstanding the erroneous written agreements, the mistake will not be presumed because it is alleged, nor the fraud which may be charged be regarded until it is clearly proved. "The author-

ities all require that parol evidence of the mistake and of the alleged modifications must be most clear and convincing—in the language of some of the judges, 'the strongest possible'—or else the mistake must be admitted by the opposite party; the resulting proof must be established beyond a reasonable doubt. Courts of equity do not grant the high remedy of reformation *upon a probability, nor even upon a mere preponderance of evidence, but only upon a certainty of the error.'* Opinion of Lord Thurlow in *Lady Shelbourne* v. *Lord Jachiquin,* 1 Bro. Ch. Cas., 338; *Calverly* v. *Williams,* 1 Ves., 210; *Bradford* v. *Union Bank,* 13 How. (U. S.) 57-66 (14 L. Ed. 49) ; *Stickbridge Ins. Co.* v. *Hudson R. Ins. Co.,* 102 Mass., 45.

"Chapman, J., in the last-named case, said: *'The ordinary rule of evidence in civil actions, that the fact must be proved by a preponderance of evidence, does not apply to such a case as this.* The proof that both parties intended to have the precise agreement set forth inserted in the deed, and omitted to do so by mistake, must be made beyond a reasonable doubt.' " (Italics added.)

The recent opinion of this court in *Dunnavant* v. *Dunnavant,* 120 Va. 301, 91 S. E. 138, is directly in point, and, in our view of the evidence, is conclusive authority in support of the decree under review. In that case, Judge Prentis, reaffirming the rule as laid down in *Thomas* v. *Ribble,* 2 Va. Dec. 321, 24 S. E. 241, said: "That rule is there succinctly stated in these words: 'Where the instrument rises to the dignity and importance of a muniment of title, every principle of public policy demands that the proof of its former existence, its loss and its contents, should be strong and conclusive, before the courts will establish a title by parol testimony to property which the law requires shall pass only by deed or will. That courts of equity have jurisdiction to set up lost deeds or wills, and to establish titles under them, can certainly not be denied, but it is a dangerous

jurisdiction and so pregnant with opportunities of fraud and injustice that it will not be lightly exercised, nor except upon the clearest and most stringent proof.' This doctrine has been approved by this court in the following cases: *Barley* v. *Byrd*, 95 Va. 316, 28 S. E. 329; *Carter* v. *Wood*, 103 Va. 68, 48 S. E. 553; *Smith* v. *Lurty*, 108 Va. 800, 62 S. E. 789; *Johnson* v. *McCoy*, 112 Va. 580, 72 S. E. 123; *McLin* v. *Richmond*, 114 Va. 244, 76 S. E. 301; *Dickenson* v. *Ramsey*, 115 Va. 521, 79 S. E. 1025."

There is no error in the decree complained of, and it is, therefore affirmed.

*Affirmed.*